IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNION PACIFIC RAILROAD COMPANY, in
its own capacity and in its capacity as
successor to Union Pacific Railroad
Company;

v.

UNITED STATES OF AMERICA,

Defendant.

8:14CV237

MEMORANDUM AND ORDER

This matter is before the court on the parties' cross-motions for summary judgment,
Filing Nos. 50 and 51.[1]  This is an action seeking a refund of employment taxes paid by the
plaintiff, Union Pacific Railroad Company ("U.P.") under the Railroad Retirement Tax Act
("RRTA"), I.R.C. §§ 3201-3241.  Filing No. 1, Complaint.  U.P. seeks a refund of RRTA
taxes with respect to 3 types of transactions:  (1) exercises of certain nonqualified stock
options ("NQSOs") granted to employees; (2) vesting of restricted stock and restricted stock
units ("collectively, "restricted stock") granted to employees; and (3) certain payments to
union members/employees in connection with collective bargaining agreements.[2]  Id. at 4-
10.  Jurisdiction is based on 28 U.S.C. § 1346(a)(1).[3]

Defendant United State of America ("the government" or "the IRS") contends that
U.P. is not entitled to a refund because it is required to pay employment taxes under the
RRTA on "compensation."  The parties dispute whether the payments are "compensation"

---

[1] Union Pacific moves for partial summary judgment only on the issue of liability because the parties
agreed to resolve the principal legal issues in this case and then address the tax refund computations should
the Court determine that Union Pacific is entitled to a refund.  Filing No. 12, Rule 26 Report at 13-14.

[2] U.P. seeks a refund for a claimed overpayment of more than $52 million for employment taxes on
NQSOs; more than $3 million for restricted stock and RSUs; and a refund of nearly $19 million for alleged
overpayments under collective bargaining agreements.

[3] The court overruled the government's challenge to jurisdiction with respect to payments for tax years
1995 and 1996.  Filing No. 67, Memorandum and Order.

under the RRTA and whether the payees were "employees" engaged in "service," as those terms are used in the statute, at the time of the payments. The central dispute between the parties is whether "compensation" under the RRTA, defined as "money remuneration," equates to "wages" under the Social Security Act, defined as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash."

## I.    FACTS

The record shows the following relevant facts.[4]  Union Pacific Railroad Company ("U.P."), is the surviving corporation from the 1998 merger of Union Pacific Railroad Company and Southern Pacific Transportation Company. U.P. brings this action in its own capacity and as successor to the pre-merger Union Pacific Railroad Company. U.P. is a rail carrier and has its principal place of business in Omaha, Nebraska.

Stock options are contracts under which one party grants another party the right, but not the obligation, to buy or sell a set number of shares at a predetermined price within a specified period of time. The purchase price of the stock is determined on the date the stock option is granted. The predetermined price in the stock option contract is known as the "exercise price" or the "strike price." The stock option can be exercised by the option holder only after vesting. Vesting occurs after certain conditions are satisfied and set time periods have lapsed.

When an option holder exercises a stock option, the option holder pays the predetermined price of the stock to Union Pacific. Union Pacific delivers the shares of stock

---

[4] The facts are gleaned from the parties' respective statements of undisputed facts and from the evidence submitted in connection with the motions. *See* Filing No. 56, Government Brief at 8-18; Filing No. 59, U.P. Brief at 2-21; Filing No. 60, Government Brief at 5-12; Filing No. 62, U.P. Brief at 2-15; Filing No. 64, Government Reply Brief at 5-6; Filing No. 65, U.P. Reply Brief at 1-6; Filing Nos. 52-55, 57-58, 61, 63, and 66, Indices of Evidence.

to the option holder.  The option holder's decision as to whether and when to exercise a stock option is made by the option holder, as is the decision as to what to do with the stock. The transactions at issue involve option holders' exercises of NQSOs from 1991 to 2007.

A nonqualified stock option (NQSO) is a stock option that does not qualify as an "incentive stock option" under I.R.C. § 422.[5]  Restricted stock is stock that cannot be transferred or sold until a set period of time passes or certain other conditions are met, at which time the stock vests and is no longer subject to forfeiture.  Restricted-stock units (RSUs) are promises to transfer stock in the future, after a set period of time has passed or certain other conditions are met, at which time the RSU vests and is no longer subject to forfeiture.

For tax years 1981 through 1990, U.P. paid RRTA taxes with respect to NQSOs, restricted stock, RSUs, and ratification payments, without challenge.  The record shows that both prior to and after 1991, U.P. granted NQSOs to some of its employees.  The NQSOs provided the employees the right to buy stock in Union Pacific Corporation (UNP stock), U.P.'s parent company, which is publicly traded on the New York Stock Exchange.

U.P. granted these NQSOs to its employees under at least seven stock plans issued between 1982 and 2004.  These stock plans were routinely amended and were generally administered by the Compensation and Benefits Committee.  The stated general purpose of the stock plans under which the NQSOs were issued was "to promote and closely align the interests" of U.P.'s employees and shareholders "by providing stock based compensation and other performance-based compensation," and "to reward performance which enhances long term shareholder value; to increase employee stock ownership through performance-

---

[5] To qualify as an incentive stock option under that provision, the option award must meet certain requirements, including: a plan that is written, limited to employees, limited as to duration and exercise, and approved by directors and stockholders.  *See* I.R.C. § 422.

based compensation plans; and to strengthen [U.P.'s] ability to attract and retain an outstanding employee and executive team." The terms of the NQSO grants, which included the number of shares that could be purchased by each recipient, generally varied depending on whether the recipient was an executive or nonexecutive employee. U.P.'s stock plans provided for awards of incentive stock options ("ISOs"), as defined under I.R.C. § 422, as well as nonqualified stock options.

U.P.'s chief executive officer (CEO) and the compensation committee of the board of directors generally approved NQSO grants to U.P.'s executives, and made person-by-person determinations as to the terms of the grants. The CEO generally approved NQSO grants to U.P.'s nonexecutive employees based on department-head recommendations, and the terms of the grants were based on person-by-person determinations. For at least 2001 through 2007, the terms of NQSO grants to nonexecutive employees were also subject to discretionary guidelines issued by U.P.'s human resources department. The guidelines suggested different NQSO grants based on an employee's position and performance rating.

The NQSOs generally had to vest in order for U.P.'s employees to exercise them. Although the particular vesting requirements varied among the stock plans and grant agreements, the two general conditions for vesting were: 1) a minimum period for the employee to hold the option and 2) the employee's continued employment with U.P. In addition, some of the NQSOs had performance-based conditions for vesting, for example, meeting specified financial targets or attaining goals related to employee safety.

Some NQSOs were also subject to potential "clawback" (i.e., revocation) even if they had vested. Employees receiving such NQSOs were required to sign noncompete

4

agreements and to guard U.P.'s confidential information and trade secrets.  Violations of those obligations would trigger clawback of the NQSOs.

To exercise NQSOs, employees purchased UNP stock from U.P. at the strike price. On the exercise of NQSOs by its employees, U.P. delivered the UNP stock to its employees' brokerage accounts.  For federal income tax purposes, U.P.'s employees recognized ordinary income in the amount of the fair market value of the UNP stock at the time of exercise minus the amount the strike price for each share purchased.[6]  U.P. deducted the collective amount of income recognized by its employees upon exercise of the NQSOs on its federal income tax returns for 1991 through 2007.  U.P. and the employees' brokers computed the RRTA taxes due based on the difference between the fair market value of the UNP stock at the time of exercise minus the amount the employees paid for each share of the stock and U.P. collected the employee portion of the tax from the employee and remitted the employee and employer portions of the tax to the IRS.

U.P. granted restricted UNP stock (also called "retention stock") and RSUs to some of its employees that vested during the time period at issue.  On vesting, those employees received unrestricted or "vested" UNP stock from U.P.  U.P. granted restricted stock and RSUs to its employees under three stock plans issued between 1993 and 2004.  Those stock plans were also routinely amended and were generally administered by the compensation committee of Union Pacific Corporation's board of directors, or another similar committee.  The general purpose of the stock plans under which the restricted stock and RSUs were issued was the same as the general purpose of the plans under which the

---

[6] In contrast to NQSOs, ISOs, sometimes referred to as statutory or qualified stock options, receive favorable tax treatment and the difference between the disposition price and strike price is taxed as capital gain. *BNSF Ry. Co., v. United States,* 775 F.3d at 747 n.5.  Taxation of ISOs is not at issue.

NQSOs were issued.   Generally, U.P. granted restricted stock to both executive and nonexecutive employees, but it only granted RSUs to its executives.

U.P.'s Chief Executive Officer ("CEO") and the Compensation Committee of the Board of Directors generally approved the restricted-stock and RSU grants to U.P.'s executives, and they made person-by-person determinations as to the number of shares or units granted.   The CEO generally approved restricted-stock grants to U.P.'s nonexecutive employees based on department-head recommendations, and the number of shares granted were based on person-by-person determinations.   For at least 2001 through 2007, the terms of restricted-stock grants to nonexecutive employees were also subject to discretionary guidelines issued by U.P.'s human resources department, which suggested different numbers of shares based on an employee's position and performance rating.

At the time of a restricted-stock grant, U.P. would transfer the restricted UNP stock to an employee's brokerage account.   At the time that an RSU vested, U.P. would transfer the unrestricted UNP stock to an employee's brokerage account.   Although the particular vesting requirements for restricted stock and RSUs varied among the stock plans and grant agreements, the two general conditions for vesting were: 1) a minimum period for the employee to hold the restricted stock or RSU and 2) the employee's continued employment with the Railroad.   In addition, some of the restricted stock and RSUs had performance-based conditions for vesting, such as U.P. attaining return-on-investment goals.   Some restricted stock and RSU grants were also subject to potential clawback (i.e., revocation) even if they had vested.   Employees receiving such grants were required to sign noncompete agreements and to guard U.P.'s confidential information and trade secrets. Violations of those obligations would trigger clawback of the stock.

On vesting of the restricted stock or RSUs, U.P.'s employees recognized ordinary income in the amount of the fair market value of the UNP stock at the time of vesting on their federal income tax returns. U.P. correspondingly deducted the collective amount of income recognized by its employees on its federal income tax returns for those years. U.P. computed the RRTA taxes due based on the fair market value of the UNP stock at the time of vesting and the Railroad collected the employee portion of the tax from the employee and remitted both the employee and employer portions of the tax to the IRS.

U.P. entered into several collective bargaining agreements ("CBAs") with various unions during the time-period at issue. Pursuant to the agreements, U.P. made one-time lump sum specialized payments to union member employees whose unions had ratified the CBAs ("ratification payments"). The CBAs set forth various factors that the bargaining railroads would consider before making ratification payments, including whether the union member was employed on a certain date and his or her employment status. For example, under the 1996 CBAs, a person generally received a full lump-sum ratification payment from U.P. if the union ratified the agreement, the person was employed by U.P. on the date the ratification payment was made, and the employee had worked 2,000 hours in the prior year. If the employee had not worked enough hours to receive the full ratification payment, then the employee generally received a prorated payment based on the number of hours worked. U.P.'s payroll department processed the ratification payments by distributing the payments to U.P.'s employees in the form of cash or cash equivalents (e.g., checks or electronic funds transfers) net of tax withholdings. U.P. made the ratification payments to its employees separately from their standard semi-monthly wage payments. U.P.'s payroll department applied the RRTA tax rates and contribution-base limits to the taxable pay of

each of U.P.'s employees who received a ratification payment to determine the RRTA tax withholding and deposited the amount for that person.

## II.    Law

### A.    Standard of Review/Burden of Proof

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Kenney v. Swift Transp., Inc.,* 347 F.3d 1041, 1044 (8th Cir. 2003). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States District Court or in the United States Court of Federal Claims" after first filing a claim for a refund with the IRS. *See United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 4 (2008). The taxpayer has the ultimate burden of proving its entitlement to a tax refund. *IA 80 Grp., Inc. v. United States*, 347 F.3d 1067, 1071 (8th Cir. 2003).

### B.    Background

The Railroad Retirement Act ("RRA") applies to railroad companies and their employees, and is administered by the Railroad Board. 45 U.S.C. § 231f. It was first passed in 1934 and "provides a system of retirement and disability benefits for persons who pursue careers in the railroad industry." *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 573

8

(1979).  Retirement benefits paid through the RRA are funded through the RRTA.  *Hance v. Norfolk So. Ry. Co.*, 571 F.3d 511, 522 (6th Cir. 2009).  The Railroad Retirement Tax Act ("RRTA") is a subsection of the Internal Revenue Code ("I.R.C.").  I.R.C. § 3201, *et seq.* The RRA and RRTA are separate and distinct bodies of statutory law—the RRA is a "benefit" statute, the RRTA is a "taxing" statute.  *BNSF Ry. Co. v. United States*, 745 F.3d 774, 784 (5th Cir. 2014) ("Congress separated the taxing and benefit statutes[.]"); *see United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 212–14 (2001) (noting the difference in statutory goals between a benefits-eligibility statute and a tax statute).

The Railroad Retirement Act of 1937 was completely revised by the Railroad Retirement Act of 1974 ("the 1974 Act").  *See* An Act to Amend the Railroad Retirement Act of 1937 to Revise the Retirement System for Employees of Employers Covered Thereunder, and for Other Purposes, Pub. L. No. 93-445, 88 Stat. 1305 (1974); Prop. Treas. Reg. §§ 3201-3231, 58 Fed. Reg. 28366-01 (May 13, 1993).  Prior to the 1974 Act, a railroad worker could be entitled to benefits under both the social security system and the railroad retirement system.  Update of Railroad Retirement Tax Act Regulations ("RRTA Reg. Update"), 58 Fed. Reg. at 28367.  A railroad worker covered under both systems received greater benefits than a worker covered under only one of the systems.  *Id.*  The 1974 Act phased out these dual Railroad Retirement and Social Security benefits and coordinated the benefit structures of the two systems.  *Id.*

Under the RRTA, taxes are imposed on compensation earned by railroad employees.  I.R.C. § 3201(a)-(b).  Like the Federal Insurance Compensation Act ("FICA"), the RRTA imposes a tax on both employers and employees to fund the RRA's retirement and retirement benefits.  *BNSF Ry. Co.*, 775 F.3d at 750.  "The RRTA imposes a dual tax on railroad employers and employees that is used to fund annuities for retired railroad

employees" and railroad employers are "responsible for withholding the employee's share and also required to pay over both [the employer's and employee's] portions to the IRS." *Hance,* 571 F.3d at 522; *Riley v. Sun Life and Health Ins. Co.*, 657 F.3d 739, 742 (8th Cir. 2011) (noting that the funding for Social Security Act and Railroad Retirement Act benefits derives from a tax on both the employee and employer).

Benefits under RRTA are divided into two tiers—"Tier I benefits take the place of Social Security, from which railway workers are exempt, and Tier II benefits are similar to those that workers would receive from a private multi-employer pension fund." *Hance,* 571 F.3d at 522; *see Hisquierdo*, 439 U.S. at 574-575 (stating that Tier I "corresponds exactly to those an employee would expect to receive were he covered by the Social Security Act" and Tier II "like a private pension, is tied to earnings and career service"); *Duckworth v. Allianz Life Ins. Co. of North America*, 706 F.3d 1338, 1344 (11th Cir. 2013)(noting that "the RRA now offers benefits in two tiers, the first of which resembles Social Security benefits and the second of which resembles benefits paid under a private pension fund.")  Tier II is "essentially an extension of the system of railroad pension plans that then existed when the RRA and RRTA were enacted in the 1930s." *BNSF Ry. Co*, 775 F.3d at 750.

The Railroad Retirement Solvency Act of 1983, together with amendments to the Social Security Act, subjected Railroad Retirement Tier I annuity portions to federal income taxes on the same basis as Social Security benefits and made Tier II benefits and vested dual benefit payments subject to federal income tax on the same basis as private pensions, beginning with tax year 1984.  Railroad Retirement Board, Railroad Retirement Board Handbook, https://www.rrb.gov/general/handbook/chapter1.asp; *see* Pub. L. 98-76, 97 Stat. 411 (Aug. 12, 1983) *codified at* I.R.C. §§ 6050G, 3321, 3322; 45 U.S.C. § 231f-1.

C.      The Statutes and Regulations at Issue

The Railroad Retirement Act provides a system of retirement, disability, spousal and survivor benefits for employees of railroads, similar to those provided to nonrailroad employees under the Social Security Act.  45 U.S.C. § 231. *et. seq.*; *Weyerhaeuser Co. v. United States R.R. Ret. Bd.*, 503 F.3d 596, 598 (7th Cir. 2007).  The RRTA is the funding mechanism for those benefits, similar to the Federal Insurance Compensation Tax ("F.I.C.A.") for Social Security benefits.  *BNSF Ry. Co.*, 775 F.3d at 750.  The RRTA provides:

> (a) Tier 1 tax.--In addition to other taxes, there is hereby imposed on the income of each employee a tax equal to the applicable percentage of the compensation received during any calendar year by such employee for services rendered by such employee.  For purposes of the preceding sentence, the term "applicable percentage" means the percentage equal to the sum of the rates of tax in effect under subsections (a) and (b) of section 3101 [Social Security and Medicare or FICA tax] for the calendar year.

> (b) Tier 2 tax.--In addition to other taxes, there is hereby imposed on the income of each employee a tax equal to the percentage determined under section 3241 for any calendar year of the compensation received during such calendar year by such employee for services rendered by such employee. [7]

I.R.C. § 3201.  To be taxable under the RRTA, an employer must pay "compensation" to an "employee" for "service" rendered to the employer.  I.R.C. §§ 3201 and 3221.

For purposes of the RRTA, Congress specially defined the following terms: "Employee" is defined as "any individual in the service of one or more employers for compensation."  I.R.C. § 3231(b).  An employee is in the "service" of an employer if he or she

---

[7] IRC § 3241 provides for a determination of Tier 2 tax rate under a formula based on average account benefits ratio and contains a tax rate schedule (table) showing applicable percentage rates of up to 4.9%.  *See* IRC § 3241(a) & (b).  "The term 'account benefits ratio' means, with respect to any fiscal year, the amount determined by the Railroad Retirement Board by dividing the fair market value of the assets in the Railroad Retirement Account and of the National Railroad Retirement Investment Trust (and for years before 2002, the Social Security Equivalent Benefits Account) as of the close of such fiscal year by the total benefits and administrative expenses paid from the Railroad Retirement Account and the National Railroad Retirement Investment Trust during such fiscal year."  I.R.C § 3241(c)(2).

is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service, or he is rendering professional or technical services and is integrated into the staff of the employer, or he is rendering, on the property used in the employer's operations, other personal services the rendition of which is integrated into the employer's operations, and he renders such service for compensation.

I.R.C. § 3231(d).  "Compensation" is defined as "*any form of money remuneration* paid to an individual for services rendered as an employee to one or more employers."  I.R.C. § 3231(e)(1) (emphasis added).   The definition of "compensation" expressly excludes, however, four categories of payments from the definition:  "the amount of any payment . . . on account of sickness or accident disability or medical or hospitalization expenses in connection with sickness or accident disability or death . . . ", certain tips, travel expenses, or any remuneration that would not be treated as wages under FICA, if FICA applied, as a qualified pension, profit-sharing, and stock bonus plan, employee annuity, individual retirement account, or deferred compensation plan.   *See* I.R.C. § 3231(e)(1)(i)-(iv);[8]  *see also* I.R.C. §§ 3121(a)(5)(A)-(I), 401(a), 403(a)&(b), 408(k)(1)&(p), 457(e)(11)(A)(ii).   The definition of "compensation" under the RRTA also separately lists twelve specific exclusions—many of which are non-cash benefits—including meals and lodging, noncash employee achievement awards, Archer MSA contributions, health savings account contributions, and qualified or incentive (I.R.C. § 422) stock options.   *See*, *e.g.*, I.R.C. § 3231(e)(1)-(12).   The exclusions from the definition of compensation under the RRTA, with few exceptions, mirror the exclusions from the definition of wages under the FICA.   Treas.

---

[8] A prior version of the Act specifically included pay for time lost due to personal injury in the definition, but "Congress deleted the . . . language from the RRTA in 1983 as part of an overhaul to both the RRA and the RRTA."  *Phillips v. Chicago Cent. & Pac. Ry. Co.*, 853 N.W.2d 636, 641 (Iowa 2014); *see Marlin v. BNSF Ry. Co.*, 2016 WL 825146, at *2 (S.D. Iowa 2016).

Reg. § 31.3121(a)-1, 31.3231(e)-1, 31.3231(e)-2 (as amended by T.D. 8582), 1995-5 I.R.B. 38, 1994 WL 16000423 (F.R.), 59 Fed. Reg. 66188-01, 66188 (December 23, 1994).

FICA's definitional section provides:  "[f]or purposes of this chapter, the term 'wages' means all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash," with certain limited exceptions. I.R.C. § 3121(a).   Under FICA, "employment" is defined generally as "any service, of whatever nature, performed (A) by an employee for the person employing him."  I.R.C. § 3121(b).  The definition of wages in section 3121 of FICA encompasses a broad range of employer-furnished remuneration in order to accomplish the broad remedial purpose of the Social Security Act.  *CSX Corp. v. United States,* 518 F.3d 1328, 1333 (Fed. Cir. 2008); *see United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1405 (U.S. 2014) (finding severance payments constitute taxable wages and recognizing that simplicity of administration and consistency of statutory interpretation instruct that the meaning of "wages" should be in general the same for income-tax withholding and for FICA calculations).  The term "wages" encompasses more than the amount paid for particular services rendered; as long as the payment in question is remuneration for the overall employment relationship, it is properly encompassed within the term "wages" under section 3121(a) of FICA.  *Id.*; *see Abrahamsen v. United States*, 228 F.3d 1360, 1364 (remuneration for employment includes compensation "not only work actually performed, but also the entire employer-employee relationship for which compensation is paid to the employee by the employer").  Similarly, with respect to income taxes, "gross income" is widely recognized as an incredibly broad term.  *See, e.g., Comm'r v. Kowalski*, 434 U.S. 77, 82 (1977); *Milsap v. Comm'r*, 387 F.2d 420, 423 (8th Cir. 1968).

Other sections of the Internal Revenue Code refer to tax treatment of qualified stock options, restricted stock, employee stock purchase plans, and other forms of deferred compensation.  *See* I.R.C. §§ 421, 422, 423.  Favorable tax treatment is afforded to qualified options.  I.R.C. § 421; *see BNSF Ry. Co.*, 775 F.3d at 746 n.5.  The legislative history explains that the policy basis for the difference in treatment of stock issued under qualified plans and stock issued under plans that do not qualify is to encourage long-term employee ownership of company stock.  *Kolom v. C.I.R.*, 454 U.S. 1011, 1015 (1981).  Tax on stock transferred under a qualified plan is deferred until the stock is sold, and any gain is then taxed at capital-gains rates provided certain other requirements are met.  *Id.* at 1012; *BNSF Ry. Co.*, 775 F.3d at 746 n.5.  There is a conforming exclusion of statutory stock options from employment taxes and income tax withholding, but not for nonqualified stock options.  *See* H.R. REP. No. 108-548(I) at 145 (2004), *reprinted in* 2004 U.S.C.C.A.N. (118 Stat.) 1418, 2004 WL 1380512, *20-*21 (Leg. Hist.) (noting that statutory stock options are required to meet certain Internal Revenue Code requirements, intended to make exercise of incentive stock options or employee stock purchase plan options a tool of employee ownership rather than a form of compensation, that do not apply to nonqualified stock options); *see* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 261 (to be codified at I.R.C. §§ 421(b), 423(c), 3121(a), 3231, and 3306(b)).

In its regulations, the IRS defines compensation under the RRTA as having "the same meaning as the term wages in section 3121(a) [FICA], determined without regard to section 3121(b)(9), except as specifically limited by the Railroad Retirement Tax Act (chapter 22 of the Internal Revenue Code) or regulation."  Treas. Reg. § 31.3231(e)–1, Treas. Reg. § 31.3231(e)–1.  The prior regulation had provided that "[t]he term 'compensation' means all remuneration in money, or in something which may be used in

lieu of money (for example, scrip and merchandise orders), which is earned by an individual for services rendered as an employee to one or more employers or as an employee representative."  26 C.F.R. § 31.3231(e) (1990).[9]   The agency explained the change— conforming the definition of "compensation" to that of "wages" under FICA— was made because of significant similarities between the FICA and the RRTA, noting that

> Legislation enacted since the adoption of the existing regulations has made the RRTA Tier 1 tax identical to the FICA tax as well as conforming the Tier 1 wage ceiling to the FICA wage ceiling.  Along with conforming the structure of the RRTA to parallel that of the FICA, the exclusions from the definition of compensation under the RRTA, with few exceptions, mirror the exclusions from the definition of wages under the FICA.  These exclusions from compensation include non-monetary benefits such as fringe benefits, meals and lodging excludable under section 119 of the Internal Revenue Code, and employer-paid life insurance premiums for group term life insurance under $50,000.  In amending RRTA, Congress often indicated the purpose was to provide conformity to FICA.  Congress has added references to FICA provisions in the RRTA definition of successor employer (section 3231(e)(2)(C)) and the rules for nonqualified deferred compensation (section 3231(e)(8)).  In addition, Tier 1 benefits are designed to be equivalent to social security benefits and are subject to federal income taxation in the same manner as social security benefits.  Because the two statutes are not completely identical, the language of the regulation indicates that the term compensation has the same meaning as the term wages, except as specifically limited by the Railroad Retirement Tax Act.

Treas. Reg. 31.3231(e)-1, 31.3231(e)-2, 59 Fed. Reg. 66188-01, 66188.

In the context of holding that severance payments fall within the broad definition of "wages" under FICA, the Supreme Court recently reaffirmed the principle that the term "service" in the social-security context means "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Quality Stores, Inc.*, 134 S. Ct. at 1400 (quoting *Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 365-66 (1946)).  The Eighth Circuit has held likewise with respect to FICA.  *See*

---

[9] The earlier regulation would apply to U.P.'s claims for tax years 1991 and 1992 because the amended regulations apply for calendar years beginning after December 31, 1992.  *See* Treas. Reg. §§ 31.3201 – 31.3231, 59 Fed. Reg. 66188-01.  That fact is of no consequence under the court's analysis.

*Mayberry v. United States*, 151 F.3d 855, 860 (8th Cir. 1998); *accord CSX Corp.*, 518 F.3d at 1333.  The IRS has also ruled that a lump-sum "signing bonus" on a contract or a "ratifying bonus" pursuant to a collective bargaining agreement constitute wages under FICA.  Rev. Rul. 2004-109, 2004-2 C.B. 958, 2004 WL 2659666.

    D.  Statutory Interpretation

   Courts interpreting a statute follow a familiar two-step framework.  *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  First, the court uses traditional tools of statutory construction to determine if Congress has unambiguously spoken to the question at issue.  *Andrade-Zamora v. Lynch*, 814 F.3d 945, 951 (8th Cir. 2016); *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 940 (8th Cir. 2014).  If the statute is unambiguous, the court simply applies the statute.  *Id.*

   In undertaking statutory construction, courts are required to "examine the text of the statute as a whole by considering its context, object, and policy."  *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011).  Ultimately, the court's "objective in interpreting a federal statute is to give effect to the intent of Congress."  *United States v. Vig*, 167 F.3d 443, 447 (8th Cir. 1999).  The basic principle is that a statute must be construed "so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  The court cannot interpret words in isolation, but "must interpret the statute as a symmetrical and coherent regulatory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  A court's duty "after all, is 'to construe statutes, not isolated provisions.'"  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *Graham Cnty. Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)).  Interpretation of a word or phrase "'depends upon reading the whole statutory text, considering the purpose and context of the statute, and

16

consulting any precedents or authorities that inform the analysis.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1327 (2011) (quoting *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006)); *see also Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008) (construction of a statutory term "must, to the extent possible, ensure that the statutory scheme is coherent and consistent"); *Deal v. United States*, 508 U.S. 129, 132 (1993) (stating it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").

"[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Utility Air Regulatory Grp., v. EPA*, 134 S. Ct. 2427, 2442 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).  "A statutory 'provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'" *Id.* (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)).  "Thus, an agency interpretation that is 'inconsisten[t] with the design and structure of the statute as a whole, does not merit deference." *Id.* (quoting *University of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013)); *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983) (stating that "[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute").

Also, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.  In general, under the *in pari materia* canon of

statutory interpretation, statutes addressing the same subject matter should be read as if they were one law. *BNSF Ry. Co.*, 775 F.3d at 755; *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006). The statutory interpretation canon of *noscitur a sociis* recognizes that an ambiguous term may be given more precise context by the neighboring words with which it is associated. *BNSF Ry. Co.,* 775 F.3d at 755.

If the statute is ambiguous, the court proceeds to the second step of *Chevron* and applies the agency's interpretation if it "is based on a permissible construction of the statute." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013). This approach "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *King v. Burwell*, 135 S. Ct. at 2488 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159).

*Chevron* deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–227 (2001). The Treasury Department is explicitly authorized to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. *Mayo Found. for Med. Educ. and Research v. United States,* 562 U.S. 44, 57-58 (U.S. 2011); *see* I.R.C. § 7805(a). The Supreme Court "has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code." *Bob Jones Univ.,* 461 U.S. at 596 (characterizing I.R.C. § 7805(a) as "essential to efficient and fair administration of tax laws").

Pursuant to that authority, the Internal Revenue Service has promulgated regulations for the enforcement of the Internal Revenue Code. *See, e.g.*, 26 C.F.R. part 31, *et seq.* "[E]xpress congressional authorizations to engage in the process of rulemaking," like those

18

granted to The Treasury Department under I.R.C. § 7805, are "a very good indicator of delegation meriting *Chevron* treatment." *Mayo Found.,* 562 U.S. at 58 (quoting *Mead,* 533 U.S. at 229).  The IRS complied with notice and comment rulemaking procedures when implementing the amendments to the employment tax regulations under §§ 3201 through 3231 if the Internal Revenue Code.  *See* Treas. Reg. §§ 31.3201-31.3231, 59 Fed. Reg. 66188-01 (Dec. 23, 1994); Prop. Treas. Reg. § 3201-3231, 58 Fed. Reg. 28366-01 (May 13, 1993) (notice of proposed rulemaking and notice of public hearing).

*Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers, but, even under this deferential standard, "'agencies must operate within the bounds of reasonable interpretation." *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) (quoting *Utility Air Regulatory Grp.,* 134 S. Ct. at 2442) (internal quotation marks omitted).  An agency may not exercise its authority "in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125 (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)).

Thus, courts play a gatekeeping role under Chevron by "taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority." *City of Arlington,* 133 S. Ct. at 1874.

III.   **DISCUSSION**

The court first finds that it is a close question whether the statutory provision at issue—defining "compensation" as "any form of money remuneration" is ambiguous so as to require the court to undertake step two of the familiar *Chevron* analysis.  In light of the text, structure, purpose and legislative history of the statute, applying the traditional tools of statutory interpretation to the phrase "any form of money remuneration" in the definitional

provision of the RRTA, the court finds that the provision can be readily understood to encompass the transactions at issue without regard to the agency's definition of "compensation" to equate to "wages."  The court can extrapolate a Congressional intent to tax all remuneration under the RRTA definition from the plain meaning of the words in the context of associated language, the scope of exceptions to the definition, and the overall purpose of the statute.

Starting with the text of the statute, the term "compensation" is modified by two antecedents:  "any form of" and "money."  One of these terms, money, modifies "remuneration" and is arguably a narrowing modifier.  However, "money" is in turn modified by "any form of," which arguably broadens the definition of "money remuneration."  The Railroad's focus on the meaning of the word "money," arguing it plainly means cash payment, ignores the fact that the use of "any form of" preceding the phrase implies that the reference is to species of payments other than "cash."

There is no dispute that the term "remuneration" is commonly understood to mean payment for services.  "Money" is used not as a noun, but as an adjective, describing the form of remuneration.  Used in that sense, "money" can either have an expansive meaning connoting "of or relating to capital or finance in general," or can be regarded as simply a redundancy or archaic usage, similar to legalese such as "money damages" and "money judgment."  The court finds the words "remuneration," "wages," and "compensation" are generally interchangeable words in the context of employment and taxation whose meaning is not significantly altered by the addition of a descriptive or illustrative modifier such as "money."  In view of the common use of the word "money" in legal parlance as an adjunct to words such as damages and judgment, the court finds the phrase "money remuneration" is commonly understood in the context of a tax statute to mean the same thing as wages.  Any

subtle distinctions between "wages" and "money remuneration" are meaningless in the context of the history of the RRTA and the interplay between the RRTA and other provisions of the Internal Revenue Code.

Both the FICA statute and the RRTA contain explicit exclusions from the respective definitions.  The scope of the definition is measured with reference to its exceptions, the assumption being that the exclusions would have fit within the scope of the definition had they not been excluded.  Under both the RRTA and FICA, the exclusions are couched in terms of "payments," itself a broad term, and include non-cash items such as sickness or accident disability payments, payments for insurance, severance, pension plan payments and payments under deferred compensation plans.  See *Quality Stores*, 134 S. Ct. at 1400 (noting the statutory exception for severance payments would be unnecessary were severance payments in general not within FICA's definition of wages").

Contrary to the Railroad's argument, the statute does not clearly present a definition that excludes non-cash benefits like those at issue herein.  Dictionary definitions of "money" as a noun include "any circulating medium of exchange, including coins, paper money, and demand deposits," "a capital to be borrowed, loaned or invested," and " any article or substance used as a medium of exchange, measure of wealth, or means of payment."  *See Money*, Dictionary.com Unabridged (2016), http://www.dictionary.com/browse/money (last accessed: June 16, 2016).  "Money can also mean "a medium of exchange," that is, "anything generally accepted as payment in a transaction and recognized as a standard of value," or as an asset that can easily be converted to cash."  Merriam–Webster's Collegiate Dictionary 750 (10th ed.1994); Black's Law Dictionary 1072, 1096 (9th ed. 2009); *BNSF Ry. Co.*, 775 F.3d at 752.  As an adjective, "money" means "of or relating to money to capital or finance.   *Money*, Random House, Inc., *Dictionary.com Unabridged* (2016),

http://www.dictionary.com/browse/money (last visited June 16, 2016).   Synonyms for "money" include cash, capital, funds, payments, salary, wages, and property.   *See Money*, *Thesaurus.com*, *Roget's 21st Century Thesaurus* (3d ed. 2009), http://www.thesaurus.com/browse/money (last visited June 16, 2016).   "Wages," defined under FICA as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash," has essentially the same commonly understood meaning as "money remuneration" as defined above.

The timing of the imposition of the taxes on the nonqualified options and restricted stock awards—at the time of exercise or when no longer forfeitable, rather than at the time of the award—also supports an understanding of the meaning of "money remuneration" as synonymous with wages, which are subject to tax when paid.   The stock options when exercised and restricted stock when vested are examples of assets that, since they are traded on a national exchange, can readily be converted to cash.   Further, the options at exercise and restricted stock at vesting are "a medium of exchange," that can be generally accepted as a payment in a transaction; the shares have a recognized value that can be traded, transferred, exchanged or borrowed against.   Looking to the plain meaning of the statute, U.P. has not shown that the text of the statute reflects that Congress intended there to an incongruity between employment-tax treatment of "compensation" under the RRTA and that of "wages" under the FICA.   To the contrary, all indications are that Congress intended similar treatment.

The structure of the statute provides further support for the notion that compensation (any form of money remuneration) under the RRTA and wages (all remuneration for employment) under FICA mean the same thing.   The meaning of "money remuneration" is more precisely understood by looking at the four categorical exclusions from the definition

22

and at the specific listed exclusions.  Those include non-cash benefits, and also correspond to exclusions from "wages" under the Social Security Act, examples of deferred compensation given special treatment under the income tax and capital gains tax provisions of the Internal Revenue Code, as well as to benefits under other employee benefits statutes such as the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.

Analysis of the purpose of the RRTA is perhaps the best indication that the court should read "compensation" in the RRTA as generally commensurate with the definition of "wages" in the FICA.  The court disagrees with the Fifth Circuit Court of Appeals finding that the purpose of the statute "supports multiple interpretations," suggesting ambiguity.  *See BNSF*, 775 F.3d at 755.  It is well-established that RRTA and FICA are parallel statutes. FICA has been held to have a remedial purpose, mandating that compensation under the FICA be interpreted broadly.  So too does the RRTA have a remedial purpose.  The RRA was enacted to promote railroad careers and provide retirement security to railroad workers. It was enacted because the then-existing railroad employer-sponsored retirement plans were "rife with problems such as inadequate funding, capricious terminations, and limited benefits for disabled employees."  *Id.* at 750.  The Railroad Tax Act was later enacted to provide a funding source for the benefits provided by the RRA.  The RRTA has been amended several times over the years, always with the stated goals of aligning the RRTA and FICA and ensuring the solvency of the railroads' benefits system.  It would be contrary to the purposes of both statues to interpret the provisions at issue to exclude a category of payments under one statute from taxation while requiring similar payments to be taxed under the other.  The creation of the two-tiered system fulfills the purpose of alignment: aligning benefits under Tier I with social security benefits and aligning Tier II benefits with

those under a private pension system.  The important goal of maintaining solvency would not be advanced by constraining the funding source.

In this connection, examination of the tax treatment of private pension plans is illuminating.  Statutory stock options, also known as "qualified" or "incentive" stock options," are specifically excluded from the definition of both compensation under RRTA and wages under FICA, but non-qualified stock options are not.  Non-qualified options and restricted stock awards in the private sector are generally subject to employment taxes.  The exclusion of qualified options under FICA dovetails with the tax treatment of qualified options for income tax and capital gains purposes.  The stated purpose of the qualified or incentive stock option exclusion is to encourage investment in companies and provide a stake in capital.  The rationale underlying the exclusion for benefits in the form of qualified stock options is that they are more akin to ownership than to remuneration.  The matching exclusions signal congruity between the FICA and RRTA provisions and provide cohesiveness within the entire Tax Code.  Accordingly, it appears from the overall structure of the Tax Code that nonqualified options and restricted stock are reasonably meant to be considered "compensation" under RRTA and "wages" under FICA for employment tax purposes.

The legislative history also supports the conclusion that, in the context of the overall statute, Congress has spoken clearly and "money remuneration" under the RRTA is equivalent to "wages" under FICA.  The use of the phrase "any form of" suggests Congress meant to encompass non-cash payments.  The statute was amended over the years with an eye toward financial security and solvency.  The RRTA was overhauled in 1983 with the express goal of conforming the statute to FICA.  The two-tier structure respects the historical railroad pension plan benefits system and aligns it with benefits found in the

24

private sector. The railroad has not presented a cogent argument that the Railroads' retirement system was intended to be subject to a different employment tax scheme than other industries' retirement systems and pension plans.

Even if the statute could be said to be ambiguous, the IRS's regulation satisfies the reasonableness standard under *Chevron* step two. There is no dispute that the IRS possesses the authority to prescribe rules and regulations to enforce the Internal Revenue Code. The IRS's definition is a permissible construction of the statute. The challenged regulation provides that the term "compensation" as relevant to the RRTA has the same meaning as "wages" under FICA, except as specifically limited by the RRTA. The court does not view the essentially meaningless modifier "any form of money" to be any such specific limitation on the term "remuneration." Rather, the text and structure of the regulation, in the context of the statute as a whole, suggests that the specific limitations referred to are the listed exclusions under the RRTA that differ from the listed exclusions under FICA. Those differences, involving, for example years-of-service requirements, occupational disability benefits, and spousal or survivor benefits, do not affect the taxability of the transactions at issue and do not affect the outcome of this case. The differences reflect the differences in the RRTA and FICA statutes. RRA benefits are broader than Social Security benefits in that RRA benefits include some items that social security does not, i.e., sick time, unemployment benefits, etc. The IRS regulation is qualified to reflect that fact.

The IRS regulation is a permissible construction of the statute that fulfills the statutes purpose and conforms to Congressional intent. To hold otherwise would be to undermine the purpose of the RRTA and to damage the solvency of the Railroad Retirement system. There has been no showing that Congress intended only to tax cash benefits when it

federalized the Railroad Retirement system.  Any suggestion that Congress, either initially or through numerous amendments to the RRTA over the years, intended to mimic the narrow cash-only benefits base of the underfunded, potentially insolvent private system it chose to replace defies logic and common sense.  Because similar language in similar statutes should be interpreted similarly, the IRS's decision to interpret the FICA and RRTA together is not unreasonable.  The Railroad attributes too much importance to what amounts to an inconsequential difference in phrasing the definition of a term that is clearly intended to mean the same thing that it means in a parallel statute so as to function as part of a cohesive, comprehensive statutory taxation and benefits system.  U.P. has not sustained its burden to show that it is entitled to a refund of taxes paid on NQSOs or restricted stock.

With respect to the ratification payments, U.P. similarly has not shown it is entitled to a refund.  Because U.P. made the ratification payments in cash or cash equivalents, there is no question that they are "money remuneration" under I.R.C. § 3231(e).  The undisputed evidence also shows that U.P. made the payments to its employees for services rendered. Generally, individuals received ratification payments from U.P. in their capacities as current or former U.P. employees, not as union members.  A union member who did not work for U.P. would not have received a payment from U.P.  The amounts of the payments were, in some cases, pro-rated based on length of service or conditioned on the employee having achieved seniority status.  U.P. concedes the payments were made through its payroll department, and has not rebutted the presumption under applicable Treasury Regulations that such payments are presumed to be compensation for services rendered.  Moreover, it is clear that the payments were made pursuant to collective bargaining agreements that are essentially employment contracts as part of an employer-employee relationship.  *See*

26

*Quality Stores, Inc., 134 S. Ct. at 1400*; Rev. Rul. 2004-109, 2004-2 C.B. 958, 2004 WL 2659666.   For the reasons stated above in connection with "wages" vis-a-vis "compensation," the court finds the ratification payments are compensation for services under I.R.C. § 3231 and are subject to employment tax.  Accordingly, U.P. has not shown it is entitled to a refund of employment taxes for ratification payments.

IT IS ORDERED that:

1.      The Government's motion for summary judgment (Filing No. 50) is granted.

2.      Union Pacific Railroad Company's motion for summary judgment (Filing No. 51) is denied.

3.      A judgment of dismissal in conformity with the Memorandum and Order will issue this date.

Dated this 1st day of July, 2016.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge